WISE v. BROOKLYN HEIGHTS R. CO.

(Supreme Court, Appellate Division, Second Department. December 12, 1899.)

1. STREET RAILWAYS—INJURIES TO PASSENGER—CONTRIBUTORY NEGLIGENCE—
QUESTION FOR JURY.
  Plaintiff alighted at night from a street car at a station in the surburban portion of a city, erected for the use of passengers, not at the intersection of any street, and, on starting to cross a parallel track, was struck and injured by a car running at a high speed, on a down grade, in the opposite direction. The car from which plaintiff alighted obstructed the view of the approaching car, which at the time was from 800 to 1,200 feet distant. *Held*, that since, by reason of the darkness and existing obscurities, plaintiff might not, in the exercise of prudence, have determined that the car was too close to render it dangerous to attempt to cross the track, the question of his negligence should have been submitted to the jury.

2. SAME—COMPANY'S DUTY—SAFE PLACE TO ALIGHT.
  Since a street-railway company is not justified in running its cars at a high speed past a car standing on a parallel track to allow passengers to alight, who might cross to either side of the street, its act in so doing, rendering the place appointed for passengers to alight dangerous, so far excuses plaintiff's failure to observe the approaching car as requires the submission of his negligence to the jury.

  Goodrich, P. J., dissenting.

Appeal from trial term, Kings county.

Action by George Wise against the Brooklyn Heights Railroad Company. From a judgment dismissing the complaint at the close of plaintiff's evidence, he appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

S. S. Whitehouse, for appellant.
John L. Wells, for respondent.

HATCH, J. The testimony disclosed that the plaintiff was a passenger upon the defendant's car for the purpose of transportation from the point where he entered the car to a trolley station on Bay Ridge avenue, between Tenth and Eleventh avenues, in the borough

of Brooklyn. This point is in the suburban section of the borough of Brooklyn, and is comparatively thinly populated. It is in a long block, and the trolley station is not at the point of intersection of any street, but was established for the accommodation of passengers living in that locality. The plaintiff arrived at the point of destination at about 10 o'clock at night. The car upon which he was riding did not entirely stop, but ran very slowly,—sufficiently so for the plaintiff to alight without injury. The plaintiff lived between Tenth and Eleventh avenues, and, to reach his habitation, he was required to cross the adjoining track, upon which the cars ran in an opposite direction. He passed by the rear end of the car upon which he had been riding, and which still continued in motion, reached the first rail of the second track, was struck by the fender of a car running thereon at a high rate of speed, and received the injuries of which complaint has been made. The proof was sufficient to establish negligence upon the part of the defendant in the operation of the car which struck the plaintiff, but the court was of opinion, within the rule laid down by this court in Landrigan v. Railroad Co., 23 App. Div. 43, 48 N. Y. Supp. 454, that the plaintiff was guilty of contributory negligence in failing to observe the approach of the car, and for this reason it dismissed the complaint.

While the case in some of its features is quite similar to the case which controlled the action of the court, yet in some of its aspects it is clearly distinguishable therefrom. In the case relied upon, the accident happened in broad daylight; and it was evident that the plaintiff, in the exercise of ordinary care, ought to have discovered and avoided the approaching car. In the present case, the accident happened at night, and the distance from which the car might have been observed was not entirely clear; it being insisted by the plaintiff that the obstruction of the car from which he had alighted, and the surrounding darkness after he had passed it, rendered the proximity of the approaching car quite uncertain. It appeared from the testimony of the motorman upon the car from which the plaintiff had alighted that when the plaintiff alighted the approaching car was then distant from eight to twelve hundred feet, at a time when it was visible to him. The approaching car ran upon a descending grade, and, if the plaintiff saw it at the time when he alighted, he might well have assumed that he would be able to cross the adjoining track before it reached such point; and the question of whether ordinary prudence required him to again look before crossing the track would have been clearly a question for the jury. The plaintiff, however, testified that as he passed the first car he looked in the direction of the approaching car, but did not discover its proximity to him at that time. Whether he should have then seen that the car was in close proximity, and likely to render the crossing dangerous, is a matter which we think presented a question for the jury, under all the circumstances surrounding the situation. It is easy of deduction, we think, that a person, in the light of day, with nothing to obstruct his vision, ought to discover the approach of a car, if he used his eyesight; and yet, at the same place, by reason of darkness and the existing obscurities, he might not, in the exer-

cise of prudence, determine that the car was too close to be danger-
ous to attempt the crossing of the track, and under such circum-
stances the question ought not to be answered by the court.

But there is another view of the case which tends strongly to ex-
cuse the plaintiff's act. While it is true that in the thickly-settled
parts of the city the practical operation of cars does not admit of
the actual stoppage of an approaching car at a street crossing where
a car running in the opposite direction is at a standstill for the pur-
pose of permitting passengers to alight, as such stoppage might con-
tinually embarrass the traffic of the street, yet such rule does not
apply in suburban localities, where the burden of use of the street is
practically limited to the passage of cars thereon, and few vehicles.
Under such circumstances, the railroad company, in the operation
of its cars, has the practical control of the situation, and may, by
the exercise of little care, make the place where passengers are ex-
pected to alight perfectly safe, so far as its operation is concerned,
with little or no hindrance to any other persons or vehicles making
use of the street. When a car has come to a standstill, or is moving
so slowly as to permit persons to alight, and passengers do alight
at such place, the railroad company is chargeable with notice that
the passenger thus alighting is as likely to pass to one side of the
street as to the other; and under such circumstances the company
ought to be, and is justly, held to a rigid degree of care in making
the place safe for the passenger to reach either side of the street.
Under such circumstances, there is scarcely justification for the com-
pany to run its cars at a high rate of speed past the standing car,
which it knows is in that position for the purpose of permitting pas-
sengers to alight; and, as the whole situation is the creation of
the defendant, it ought not to be excused for inflicting injury upon
a passenger which it has carried to that point, unless such passen-
ger be the willful or heedless instrument of his own injury. Under
such conditions, we think it does not establish any harsh rule, or
mitigate in any sense the doctrine of ordinary care, for the passenger
to assume that, during the time necessary for him to alight and
reach a place of safety upon either side of the street, the defendant
will not make the surrounding conditions dangerous to him. We
think, therefore, that the conduct of the plaintiff, under the circum-
stances of this case, is to be governed by the surrounding conditions,
measured by the obligation which the defendant owed him to not
make the place dangerous, and so far excuses his failure to observe
the approaching car as requires the submission of his negligence to
the scrutiny of a jury. The case of Thompson v. Railroad Co., 145
N. Y. 196, 39 N. E. 709, is not in contradiction of this view. The
attempt to cross the street in that case was at a point where there
were no intersecting streets, and no station at which passengers
were expected to alight, and the car was run through a thickly-
settled locality. Besides, the plaintiff in that case was the heedless
instrument of her own injury. While we might be willing to say
that the doctrine announced in the Landrigan Case would be con-
clusive, had this accident happened in the light of day, and in a
thickly-settled locality, we are not willing to say that such rule

should be applied to the locality and the conditions which surrounded this accident. We conclude, therefore, that the case should have been submitted to the jury; and for this reason the judgment should be reversed, and a new trial granted.

Judgment reversed, and new trial granted; costs to abide the event.

WOODWARD, J., concurs. CULLEN and BARTLETT, JJ., concur in result.

GOODRICH, P. J. (dissenting). Stare decisis is my reason for dissenting from the opinion of Mr. Justice HATCH. In Thompson v. Railroad Co., 145 N. Y. 196, 39 N. E. 709, a girl 14 years of age, while playing a game of "I spy" in the street, was killed by a passing car. The court reversed a judgment against the defendant on the ground that the evidence clearly showed the person injured to have been guilty of contributory negligence. One statement of the learned judge who wrote the opinion is singularly applicable to the present controversy:

"It is said that she may have been deceived in reference to the approaching car by reason of its speed, but she could not have been deceived unless she saw it. Had she seen it approaching before the other car passed, she would hardly have been justified in attempting to cross the street after the first car had passed without again looking for the approaching car." Pages 200, 201, 145 N. Y., and page 710, 39 N. E.

In Landrigan v. Railroad Co., 23 App. Div. 43, 48 N. Y. Supp. 454, we reversed a judgment entered upon a verdict in favor of the plaintiff on the sole ground that the evidence showed that the plaintiff was guilty of contributory negligence. Mr. Justice Willard Bartlett, writing the unanimous opinion of the court, said:

"The plaintiff alighted and went around the rear of the car, towards the further sidewalk of Broadway, in order to reach which it was necessary for him to pass over the down track of the railroad line. After he got upon this down track he was struck by the corner of the dashboard of a mail car coming in the direction opposite to that pursued by the car which he had just left, and was knocked over into the gutter. Before he stepped on the rail he says he looked up to see if any car was coming, and he saw no car. Broadway is straight at that point, and there was nothing in the way to prevent him from seeing the approaching car. Nevertheless, he swears positively that he did not see it until after he stepped on the first rail of the down track, when he perceived it about twelve feet away. At that instant a fireman on the opposite side of the street gave a warning cry, whereupon the plaintiff backed off the track, but not quickly enough to avoid injury."

The opinion declares that the evidence tended to establish negligence on the part of the defendant, but the court also held that the plaintiff—

"Failed to sustain the burden which the law placed upon him, of proving affirmatively that the injuries which he sustained were not due to his own imprudent conduct or lack of care. Under the circumstances, as he narrates them, it is impossible to avoid the conclusion that if he had looked up the unobstructed street, to the extent and with the vigilance demanded by the exercise of ordinary prudence, he would certainly have perceived the car with which he collided a moment later. In such a situation as he occupied, it is not only necessary for a traveler to turn his eyes in the direction from which danger may be expected, but he must actively exercise his power of vision, and not step blindly into peril."

Mr. Justice HATCH distinguishes that case from the one at bar because, as he says, the Landrigan—

"Accident happened in broad daylight, and it was evident that the plaintiff, in the exercise of ordinary care, ought to have discovered and avoided the approaching car. In the present case the accident happened at night, and the distance from which the car might have been observed was not entirely clear; it being insisted by the plaintiff that the obstruction of the car from which he had alighted, and the surrounding darkness after he had passed it, rendered the proximity of the approaching car quite uncertain."

It is true that the accident in the present case happened at night, but the approaching car could easily have been seen by the plaintiff when it was several hundred feet distant. The motorman of the car from which the plaintiff alighted was called as witness by the plaintiff, and testified that he saw the approaching car when it was at Twelfth avenue, which, as shown by the diagram in evidence, is about 1,000 feet from the trolley-pole station. I think we may assume that the approaching car was lighted, as nothing to the contrary appears; and it was for the plaintiff to prove the absence of the usual lights, if he relied upon such fact to account for his failure to see the car. In addition to this, the motorman of the car testified that in his report he stated that "all electrical appliances worked in a first-class and satisfactory manner," and on the trial he testified that this part of his report was true. The plaintiff says that when he rose from his seat he looked, and did not see the car or any lights. The testimony of the plaintiff at this point becomes very important:

"Q. The car was, you say, still in motion when you stepped off? A. It might have been a little in motion, but it was virtually stopped, sir. Q. From which side of the car did you step off? A. Stepped off on the left side, sir, so I could get off on the sidewalk. Q. After you stepped off, Mr. Wise, what did you do? A. Well, I stood there awhile, and after I stood awhile I turned, and I says, 'I guess I had better look around;' and I looked ahead, and I seen no car, and I went about my business, and I thought to get to the other side; and that is all I recollect, sir. Q. In order to get to your home, did you have to cross the intervening track? A. Yes, sir; I had to cross it. Q. How close to the rear of that car that you got off did you cross? A. Well, I must have been within about six feet of it. I walked along a piece till I started to cross. Q. Now, tell us whether or not you had stepped upon the other track when you were struck. A. Well, that is what I can't say, sir. I don't know, sir. I don't recollect it. Q. What part of your body was struck? A. I couldn't tell you, sir."

I cannot understand why the plaintiff did not see the approaching car before he alighted, as the motorman did, for he testified that he looked in its direction. After he reached the ground, his eyes were 3 or 4 feet lower than those of the motorman as he stood on the car, but even then the approaching car could have been seen at a great distance. The diagram in evidence shows that on Bay Ridge avenue, from the scene of the accident to Eleventh avenue, there is an up grade of 14 inches in each 100 feet, and that the crest of the hill is at the intersection of that avenue with Bay Ridge avenue, from which the grade of the latter avenue begins to descend at the rate of 9 inches in each 100 feet. The place of the accident was on the up grade, more than 300 feet from the crest of the hill. The eyes of the plaintiff, as he stood there between the tracks, must have been at least 5 feet

from the ground; that is, taking into account the grade, 1 foot higher than the crest of the hill, so that he could look over it, and down the hill, beyond Eleventh avenue. The headlight of a trolley car, by common observation, is at least 3 feet above the ground. Without any very nice mathematical calculation, but with the aid of the diagram above mentioned, it is easy to see that a straight line drawn from this position of the plaintiff's eyes, 5 feet above the ground, and intersecting the crest of the hill, would, if continued, meet a point 3 feet above the surface of the down grade on Bay Ridge avenue (i. e. the headlight of an approaching car), more than 1,000 feet beyond the plaintiff as he stood between the tracks. This does not take into consideration any of the lights of the approaching car, with the exception of the headlight, but it is apparent that the upper lights could have been seen at a still greater distance. The evidence shows that the car was approaching at a rapid rate, but there must have been a considerable period of time during which the plaintiff, as he stood between the tracks, could have seen this car, if, in the above-quoted language of Mr. Justice Willard Bartlett, "he had looked up the unobstructed street to the extent and with the vigilance demanded by the exercise of ordinary prudence." If the obstruction referred to by Mr. Justice HATCH was the car from which the plaintiff alighted, he should have taken particular care before passing from behind it and over onto the other track. It is stated by Mr. Beach, in his treatise on Contributory Negligence, at section 183, that "where the view is obstructed, or where for any other reason it is difficult for the traveler to assure himself that no train is approaching, he is required to be particularly careful." But even this excuse seems to be taken from him by his subsequent testimony. He said that he looked while he was behind the car, and then walked into the space between the two tracks. His testimony at this point of the cross-examination was as follows:

"Q. And did you look while you were in between the two tracks? A. Of course I did, sir. Q. And did you look up the track again? A. No; I walked a little further, and I crossed the street across the track. Q. The question I asked you was, did you look after you got between the two tracks? A. I did, sir. Q. And what did you see then? A. I seen nothing. Q. You were then how close to the track on which the car was that struck you? A. About three or four feet. Q. And then you walked onto the track? A. To cross it; yes, sir."

The evidence shows that when the plaintiff was struck the rear ends of the passing cars were only 6 or 8 feet apart, and that the plaintiff was struck by the side of the car, or the side of the fender, before he had actually gotten on the track which he was about to cross. It is incredible that, if he looked, he could not see the approaching car, and the familiar rule has especial application here. Either he did not look, and so was negligent, or if he looked, and did not see the car when it was where he could not fail to see it if he "actively exercised" his power of vision, he was equally negligent. From this dilemma I can see no escape for him.

In Hickman v. Railroad Co., 36 App. Div. 376, 56 N. Y. Supp. 751, the court, speaking through Mr. Justice Woodward, said (pages 378, 379, 36 App. Div., and pages 752, 753, 56 N. Y. Supp.):

"It is not enough that the plaintiff should merely look in both directions; she must look for the purpose of seeing if there is danger; and if her rate of progress in passing over the danger point is so slow that a car, in traveling at a reasonable rate of speed, may be reasonably expected to have come within view, and in such a position as to cause danger, she is not excused from the duty of using her eyes because she may at some previous time have discharged this duty."

There is another view of this case which has impressed me, and this arises from the remarks of the learned justice before whom the case was tried, which appear in the course of the examination of Dempsey, the first witness called by the plaintiff, and motorman of the car which struck the plaintiff. He testified that he did not see the plaintiff until his car struck him, and that he was struck with the side of the fender or dashboard; that the car was going so fast that it went 100 feet after the accident; that the front of his car was about even with the rear of the other car at the time of the accident. Dempsey had made two sworn written reports of the accident to the defendant, —one on the night of the accident, and another two days after, in which he said that his car was going at less than its "regular gait"; that he brought it to a stand within 5 feet from the place of the accident; that at Twelfth avenue, which, as above stated, is 700 feet from Eleventh avenue, he saw the other car, and, as he was then on a down grade, shut off the power and half-set the brake; and that "just as my forward dashboard was even with car 4202 rear dashboard, and without seeing him coming, a man fell against my fender, the inside,—that is, he fell against the inside of the fender nearest the car 4202." He also testified at the trial that these statements contained in his sworn reports, so far as they related to the speed, brake, and the stumble of the plaintiff, were false, and that he made them at the request of the defendant's claim agent, in order to save himself from being discharged, but that it was true that the plaintiff fell against the fender, and that he staggered from behind the other car, and fell against the side bar of the fender. After the discharge of the witness from the defendant's employ, about six months after the accident, he volunteered to tell the plaintiff and his counsel that his statements were false, and he so testified at the trial. But he also testified that at the top of the grade, at Eleventh avenue, all the way down to the place of the accident, he was ringing his gong. It was not singular that the spectacle of a witness of this character impressed the learned trial judge with the unreliability and falsity of his testimony, as shown by the record. While it is true that the credibility of a witness is matter for the jury, and not for the court, occasions may sometimes arise where a witness is so utterly and manifestly unworthy of belief as to influence in some degree the action of the trial court. Whether this is such a case is not important, for the appellate court may properly consider all the evidence, and give to each witness and all the facts their proper weight, and decide whether there is any evidence to support a verdict. If we reject the testimony of Dempsey as wholly unreliable, the case is stripped of much testimony produced to sustain the plaintiff's theories. Aside from the plaintiff's testimony already cited, there remains only evidence to show that the approaching car was proceeding rapidly, and that the

gong was not sounding. It is true that a jury might have been justified in finding that the plaintiff looked, but, in the light of the principle already referred to, there was no evidence to overcome the presumption that if he looked he did not see the approaching car; for he testifies that he did not see it, although it must have been in plain sight when he came out from behind his own car. I do not consider this inconsistent with Luhrs v. Railroad Co., 13 App. Div. 126, 42 N. Y. Supp. 1101, in which this court held that:

"Where one or two competent witnesses testify to facts not incredible, which, if believed by the jury, would entitle the party to a verdict, the party cannot be deprived of his right to go to the jury because the witnesses who contradict his evidence are more numerous. The only remedy to the party aggrieved is to move to set aside the verdict."

Here there was evidence which clearly showed that the injury to the plaintiff was occasioned by his own negligence, irrespective of the question whether the defendant's car was proceeding at unusual speed, and without sounding the gong, which alone would not be sufficient to justify a verdict against the defendant. I think the judgment should be affirmed.